## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JAICIA VINCENT,

     Plaintiff,

     v.

MEDSTAR SOUTHERN MARYLAND
HOSPITAL CENTER,

     Defendant.

Civil Action No. TDC-16-1438

## MEMORANDUM OPINION

Jaicia Vincent, a former employee of MedStar Southern Maryland Hospital Center ("MedStar"), filed this action alleging that MedStar discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (2012); 42 U.S.C. § 1981; and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Gov't § 20-606 (West 2015). Pending before the Court is MedStar's Motion for Summary Judgment. For the reasons set forth below, the Motion is granted.

## BACKGROUND

The following facts are presented in the light most favorable to Vincent, the non-moving party:

### I. The MedStar-SMHC Integration

Southern Maryland Hospital Center ("SMHC") is located in Clinton, Maryland and was an independent entity until December 2012, when it was acquired by MedStar. James McKeon of MedStar led the initiative to integrate SMHC's billing department into MedStar. MedStar began to implement a patient accounts and billing software system known as Invision—which

led to an automation of 60 percent of the billing process—as part of a project known as the Corporate Revenue Cycle Consolidation Initiative. For the first two years following the merger, the integration process did not affect the Lab Contract Services Department, which performed billing and other tasks relating to the services provided by SMHC to nursing homes, assisted living facilities, and rehabilitation facilities. The invoice billing for the 13 nursing homes and six assisted-living facilities was still processed manually. In 2015, however, MedStar terminated contracts with three nursing homes, and the SMHC patient accounting system, based in Waldorf, Maryland, was transitioned to MedStar's Patient Financial Services Department in White Marsh, Maryland as part of the Corporate Revenue Cycle Consolidation Initiative. At least 22 employees who performed in-patient hospital billing lost their jobs during the consolidation process after being given about 90 days' notice. Of the 22 individuals whose billing and collections positions were eliminated in May and July 2015, 10 were African American, nine were white, two were Asian American, and one was Latino.

## II.    Vincent's Position

Vincent, an African American woman, was hired by SMHC in 2011 and was assigned to a satellite office in Waldorf, Maryland in October 2011. She reported to Michael Deabay until November 2013, when Deabay retired and Darlene Moody took his place. In her capacity as nursing home coordinator in the Lab Contract Services Department, Vincent performed seven different types of billing, including commercial billing and Medicare billing. In August 2013, Cheryl Begg, who had been at the hospital for over 30 years and was the Acting Director of the Patient Accounts Department, transferred to the Lab Contract Services Department in the Waldorf office because of a workplace dispute with her supervisors. Despite the reservations of Deabay, who believed that Begg had a tendency to change departments frequently, Vincent had

2

advocated for bringing Begg into the department because of her Medicare billing expertise. At the time, Vincent was unaware that Begg was not proficient in Microsoft Word or Excel, or in invoice billing. As a result, Begg's assistance was limited to Medicare billing, which did not require much time. Because Begg did not know how to do invoice billing, Vincent had her provide quality assurance by spot-checking work done by others.

In March 2014, on Deabay's recommendation, Vincent was promoted to supervisor and had two subordinates, Begg and Keisha Whetstone, a contractor. Vincent also effectively became the office manager, with additional duties such as ordering supplies and overseeing time and attendance, though her job title remained nursing home coordinator.

In 2015, Vincent became the only employee conducting nursing home billing. Whetstone had resigned from her position in January and was not replaced. That same month, McKeon asked Begg to join him to work on a special project because of her "extensive revenue cycle experience, her Medicare knowledge," and his positive experience working with Begg during the initial integration process. Joint Record ("J.R.") 33, 107. Later, in May 2015, in the lead up to the cessation of billing operations in the Waldorf office, Vincent was relocated to SMHC in Clinton where she would be supervising the front desk as the new system was being rolled out. Although she was told that she would have an office, she was placed in a cubicle in the admissions department.

### III.    Relationship with Moody

Vincent began having problems with Moody in November 2014. Until May 2015, Moody worked at SMHC in Clinton while Vincent worked at the Waldorf office. They largely interacted over telephone. Moody began to not answer her calls or emails and generally made herself unavailable to Vincent. On other occasions, she would yell at Vincent over the phone.

3

For instance, on November 24, 2014, Moody yelled at Vincent over the phone about her failure to have her office personnel sign up for a mandatory training, even though Vincent had not received an email about the event. Four employees overheard Moody speaking in a condescending and demeaning manner and saying, "Well, if I knew you were going to be that stupid . . . I would have done it myself." J.R. 59-60. In a separate incident, when Moody called Vincent to accuse Whetstone of not verifying that patients were in their system, Moody yelled at Vincent, "You're not doing your job," and continued to scream at her over the phone about Vincent and Whetstone "being stupid and not following through and doing X, Y, and Z." J.R. 60. According to Whetstone, Moody's harassment of Vincent occurred almost daily, was "unrelenting," and was at times threatening and physically humiliating. J.R. 131-133. As a result of this "constant threatening conduct" directed at both Vincent and herself, Whetstone sought other employment and resigned in January 2015. J.R. 132-133.

At various times, Moody directly told Vincent, "I would just rather not work with you." J.R 43-44. On one occasion, in July 2014, Whetstone overheard Moody tell Begg that "Jaicia won't be here long." J.A. 133. Then in December 2014, Vincent overheard a conversation between Moody and Begg in which Moody said that she was good friends with Grant McClure, whom Vincent believed to be in the Human Resources Department, and that "if I want somebody fired I can get them fired," before then looking in Vincent's direction. J.R. 45. Then, in February 2015, Moody accused Vincent of violating patients' privacy rights by discussing patient health information with other MedStar staff. Soon thereafter, however, the head of compliance assured them that such discussions did not violate any patient rights.

Moody also began to close Vincent off from actively participating in meetings or engaging in certain work. On at least three occasions, Moody invited Begg to attend meetings

4

either in place of Vincent, who was the supervisor, or with Vincent but with Begg assuming the lead role. On July 29, 2014, Moody invited Begg to attend a managers meeting relating to the MedStar integration and directed Vincent not to say anything and to allow Begg to speak instead, even though questions about the billing systems were being directed to her and Begg could not answer them. According to Vincent, after the meeting, Begg told her that Moody wanted Begg at the meeting and did not want Vincent to speak, that Moody wanted Begg to be the new nursing home manager, and that Moody told McKeon not to interact with Vincent. Vincent asserts that Begg had confided in her that Moody had told Begg that she does not like black people and warned Vincent that "you won't be here long" because Moody was training Begg to take over Vincent's job. J.R. 43, 54. Begg, however, has denied both hearing Moody make such a statement and telling Vincent of such a statement.

On another occasion, on January 16, 2015, Moody and Begg went to a MedStar corporate meeting with McKeon relating to the transition to Invision. Moody did not invite Vincent to attend. According to McKeon, he asked that Begg attend because he understood Begg to be "primarily responsible for billing nursing home lab services to private insurers and Medicare Part B," which was the subject of the meeting, and because of her overall experience with Medicare billing and SMHC's revenue cycle processes. J.R. 103. The meeting did not relate to Medicare Part A billing to nursing homes, which was the primary area of Vincent's experience. Later, in March 2015, Moody and Begg attended another corporate meeting without Vincent's knowledge. According to Vincent, she found out about the meeting later from Begg, who told her that Moody instructed her not to say anything about it to Vincent. Begg denies attending that meeting or making such a statement.

In December 2014 and January 2015, Vincent confided in two co-workers, Maureen Nelson, supervisor of compliance, and Tammy Hunt, supervisor of the microbe blood unit, about the issues she was having with Moody. She spoke with them as colleagues and friends and did not expect them to take any action based on her complaints to them. According to Vincent, she was not the only employee subject to mistreatment by Moody. Hunt, who is white, frequently called Vincent, in tears, to complain about Moody, telling Vincent that Moody was "[n]ot respecting her authority," "talking to her in a demeaning, condescending manner," and "demeaning her in front of other employees," among other incidents. J.R. 20-21. Vincent also heard of other employees, of different races, who had grievances about or were yelled at by Moody.

Vincent attempted to contact Human Resources about her relationship with Moody. On three occasions between February 2015 and July 2015, Vincent spoke with a secretary in Human Resources. Vincent asked to schedule an appointment and, when asked for a summary of the "employee issue," she said "Well, it's Darlene Moody, and I feel that I'm being mistreated and I just need to talk to [the Human Resources director] and file a grievance." J.R. 27. Vincent provided an overview of the problems she felt she was having, including being left out of meetings and off of emails, but did not provide specific details. *Id.* The secretary responded by saying "We know about Ms. Moody" and that they were busy with the merger but would try to get back to Vincent soon. *Id.* Vincent received no follow-up call.

When Deabay left SMHC, he had told Vincent that when he left MedStar, "You may run into some problems because Darlene has issues with people of a certain class." J.R. 21-22. In April 2015, Vincent spoke with Deabay about her issues, and he independently filed a complaint with MedStar in April 2015 about "Darlene's mistreatment" of Vincent. J.R. 19, 21-22.

## IV. Vincent's Termination

Unbeknownst to Vincent, MedStar management, specifically McKeon, had recommended in a June 30, 2015 email that because automation had "substantially improved the nursing home lab billing and reference lab billing processes," Vincent's position should be eliminated and only one member of the nursing home billing group should be retained. J.R. 115-116. McKeon had concluded that Begg, with whom he had worked closely from December 2012 until August 2013 in the Patients Account Department, was best suited for the role. In particular, he believed that she was the best choice because: (1) Vincent's area of expertise accounted for only a small portion of the work to be performed by the remaining employee, whereas Begg had a much broader skillset; (2) he had worked with Begg directly and found her to be "self-motivated and an independent worker"; (3) Begg had worked for SMHC for approximately 30 years in comparison to Vincent's four years; and (4) Begg had already been processing "legacy accounts" consisting of certain remaining accounts receivable, with which the remaining employee would have to assist. J.R. 107-109. The decision to eliminate Vincent's position and retain Begg was deemed final once McKeon received approval from his supervisors, Susan Whitecotton and Dan Feeley, sometime before July 14, 2015. Although McKeon's June 30, 2015 email states that "we will need to run this by Darlene Moody before a final decision can be made," McKeon has stated that this reference was to consultation with Moody about his recommendation, also contained in the email, to transition a phlebotomist to a hospital laboratory role about which Moody had relevant clinical expertise, not the decision to eliminate Vincent's position and retain Begg. J.R. 109-110, 116. On July 14, 2015, McKeon informed Moody and Grant McClure, Vice President of Professional Services and Plant Operations, of the decision. Before this decision was communicated to Vincent, Moody began to implement changes to

reflect the termination. For example, on July 27, 2015, Moody emailed Vincent to inform her that she would no longer be able to access the Invision billing system, and that Begg would be handling the Invision billing and generation of daily reports going forward. Moody also communicated to Human Resources that she "would like to do a Reduction in Force in her department" for Vincent's position. J.R. 126.

In August 2015, after receiving the email from Moody informing her that she was no longer involved with daily reports, Vincent went to Moody to tell her that she was "being discriminative" and asked if there was any issue she had with her work, to which Moody replied, "I just prefer to work with Cheryl." J.R. 51-52. Unsatisfied, Vincent went to McClure on August 14, 2015 to request a meeting to discuss her issues with Moody. Knowing that Vincent was scheduled for termination, McClure consulted with Paul Zeller, Vice President of Human Resources, who advised that the termination could still proceed. On August 18, 2015, Vincent met with Zeller and told him that "I felt I was being discriminated because of my race by Darlene Moody" and explained that Moody "would not take my phone calls, that she was being demeaning, condescending when she'd talked to me, [and] that she would not respond to my emails." J.R. 24. Vincent also reported that there were several meetings in which she was not included, and that Begg had told her that Moody said "that she did not feel comfortable working with [Vincent] because of [her] race." J.R. 24. Zeller responded by saying that "Mike Deabay made a complaint. We know about the Darlene incident." J.R. 23. Zeller then added that he would schedule a meeting between Vincent and Moody and, if they could not come to a resolution, "we will have to file it [with the] EEOC." *Id.*

That meeting took place on August 21, 2015 and was attended by Zeller, McClure, Vincent and Moody. During the meeting, after Vincent asked why she was being excluded from

meetings and asked what could be done to rectify the situation, Moody stated, "I just prefer not to work with you." J.R. 25. Vincent then said she was going to "escalate it" and began reading aloud her written notes about her grievances. *Id.* Moody then interrupted to apologize and said that she "had a lot going on" and that she would "try to do a better job to be a better leader." J.R. 25. Vincent left the meeting feeling "really happy" and believed that the situation with Moody was being addressed, if not resolved. *Id.* But on August 24, 2015, Vincent received an email requesting that she meet with Zeller and Moody. At the meeting, Zeller thanked her for her service and said that her position was terminated effective September 4, 2015, and that the decision was unrelated to her grievance and was not retaliatory. She was told that she could apply for other MedStar positions but did not do so. Vincent is currently employed part-time at the Diabetes and Endocrinology Center in Waldorf, Maryland as a contractor. After Vincent's termination, Begg handled legacy accounts and performed other work as directed by McKeon and the Patient Financial Services Department, including processing credit balance refunds and determining whether a patient has a billable claim. According to Vincent, Begg also took over Vincent's billing duties after she was terminated.

## DISCUSSION

MedStar seeks summary judgment in its favor, arguing that Vincent cannot establish a *prima facie* case of race discrimination or retaliation and that, even if she were able to do so, MedStar has articulated a legitimate non-discriminatory reason for her termination that Vincent has not demonstrated was pretextual. MedStar also contends that Vincent has no viable hostile work environment claim because the alleged harassment by Moody was not severe or pervasive, was not based on race, and cannot be imputed to MedStar.

## I.   Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.   Disparate Treatment

MedStar seeks summary judgment on Vincent's claim of race discrimination in her termination, which it characterizes as a reduction in force. To avoid summary judgment on a Title VII disparate treatment claim, a plaintiff must establish intentional discrimination through one of two methods. The plaintiff may either demonstrate through direct evidence that race "motivated the employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 133 S. Ct. 2517 (2013), or proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "under which the employee, after

establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination," *Hill*, 354 F.3d at 285.

Vincent's race discrimination claim centers on her termination. Her complaints of not being invited to meetings, having her access to certain billing systems or reports blocked, and being relocated to a cubicle rather than an office do not constitute actionable adverse employment actions that entail a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Here, Vincent provides no direct evidence that her termination or other adverse employment action was based on race. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) ("Direct evidence must be 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude *and* that bear directly on the contested employment decision.'" (emphasis added) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)). To the extent that she asserts that statements made to her by Deabay or Begg—for example, Deabay telling her that Moody "has issues with people of a certain class" or Begg saying that Moody "doesn't like black people," J.R. 21, 54—reflect Moody's discriminatory animus, they do not constitute direct evidence of discrimination because they do not reflect the requisite nexus to the termination decision. *See id.* Vincent therefore must establish her case circumstantially using the *McDonnell Douglas* framework.

### A. *Prima Facie* Case

Ordinarily, a plaintiff challenging termination must show that the plaintiff (1) was in the protected class; (2) was discharged; (3) at the time of the discharge, was performing the job at a

level that met the employer's legitimate expectations; and (4) following the discharge, was replaced by an individual of comparable qualifications outside the protected class. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993). In the context of a reduction-in-force, however, the employees "are usually meeting the employer's performance expectations, and because there are reductions-in-force, the employees generally are not replaced." *Id.* The appropriate *prima facie* framework thus requires a showing that (1) the employee was in a protected class; (2) the employee was selected for discharge from a larger group of candidates; (3) the employee was "performing at a level substantially equivalent to the lowest level of those of the group retained"; and (4) the "process of selection produced a residual work force of persons in the group containing some unprotected persons who were performing at a level lower than that at which [the employee] was performing." *Id.* The fourth element may also be satisfied by "introducing other probative evidence that indicates the employer did not treat . . . race neutrally when making its decision." *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998).

MedStar discusses the reduction-in-force framework in its Motion, while Vincent applies the traditional *prima facie* case. Because Vincent's position was eliminated, it was one of 23 relating to billing that were eliminated following the consolidation, and her job performance was not raised as an issue, the reduction-in-force framework is the appropriate test to apply. *See Grochowski v. Sci. Applications Int'l Corp.*, No. ELH-13-3771, 2015 WL 5334051, at *17 (D. Md. Sept. 11, 2015) (using the reduction-in-force *prima facie* framework in light of the "critical fact that [the plaintiff] was among nearly fifty employees terminated" in one year). The Court notes, however, that the appropriate scope of the inquiry is not whether there was race discrimination in the broad set of layoffs, but whether in reducing Vincent's group from three employees to one, there was race discrimination in the termination of Vincent, rather than Begg.

Here, the first three elements are not in dispute. As for the fourth element, Vincent has offered evidence that her work performance was superior to that of Begg. In addition to providing her performance evaluations in which her work was deemed to have exceeded expectations, the second highest rating, Vincent asserted, based on her own observations as Begg's supervisor, that Begg was skilled in handling Medicare billing but was not able to do other tasks proficiently and had to be assigned to spot-check the work of others. She recounted a July 29, 2015 meeting in which she, not Begg, was more familiar with the company's billing practices. According to Whetstone, who worked alongside Begg, Begg's work performance was "poor," her skill level was "low," and she was limited to working with one type of software and was not willing to learn new billing forms. J.R. 133-134. Particularly where Vincent was Begg's supervisor before the consolidation, yet was passed over in favor of Begg, Vincent has put forth sufficient evidence to establish a *prima facie* case that the "residual workforce," namely Begg, was performing at a lower level than Vincent. Likewise, if applying the traditional *prima facie* framework, where the fourth element is whether Vincent was replaced by a person from outside the protected class who was comparably qualified, Vincent has put forth sufficient evidence to show that she was replaced by a white employee of comparable qualifications. Accordingly, the Court concludes that Vincent has, for purposes of the motion for summary judgment, established a *prima facie* case of race discrimination in her termination.

## B. Legitimate, Non-Discriminatory Reason

Even though Vincent has established a *prima facie* case, MedStar offers what it considers to be a legitimate, nondiscriminatory reason for the elimination of her position and her termination: the integration of SMHC into MedStar and the transition of SMHC's billing systems to the more automated Invision billing system. As described in his June 30, 2015 email,

McKeon, who was leading the integration of billing systems, concluded that the transition presented an opportunity to reduce the staff conducting the nursing home and reference lab billing process such that only one full-time employee was required.

This remaining position included more duties than were performed by Vincent in her role as nursing home coordinator. The position would involve the absorption of at least some of Vincent's job responsibilities, namely nursing home billing, but the new position's duties also included oversight of lab registrations, account upgrades, processing various legacy accounts, accounts receivable follow-up, and miscellaneous revenue cycle tasks. As for who would fill the one remaining position, McKeon selected Begg. Notably, McKeon had personal experience working with Begg from December 2012 to August 2013, when she was in the Patient Accounts Department. From that time period, Begg impressed him with her revenue cycle knowledge and experience and had extensive Medicare billing and follow-up skills. Then, in April 2015, McKeon reached out to enlist Begg to assist in processing legacy accounts because of their prior working relationship and because of her revenue cycle experience. By the time of the decision to retain Begg rather than Vincent, McKeon had concluded that Begg was better qualified because based on his prior working relationship with her, he deemed her to be "an experienced revenue cycle manager," "self-motivated and an independent worker," "an experienced Medicare billing and collections representative," and her "skill set would also support other revenue cycle functions as needed." J.R. 115-116. In particular, McKeon believed that Begg had a broader skillset than Vincent's nursing home billing experience, specifically her experience as a revenue cycle manager, which aligned with the accounts receivable work; her experience with Medicare accounts receivable follow-up; and her processing of legacy accounts with McKeon since April 2015. McKeon also believed that Begg had the experience and skillset to carry out other

14

additional duties of the new position, including assisting with walk-in billing inquires, acting as a witness in collection lawsuits, and supporting Medicare billing projects. Finally, McKeon believed that Begg was better qualified because she had 30 years of experience as compared to Vincent's four years and had been the Acting Director of the Patient Accounts Department. McKeon recommended this reduction-in-force to a single position and the selection of Begg to fill the remaining position in an email of June 30, 2015 to his supervisors, Daniel Feeley and Cynthia Whitecotton. They approved the recommendations prior to July 14, 2015.

There is no evidence to suggest that this proposed reduction-in-force to one position was suggested for discriminatory reasons. As for the choice of Begg to fill the remaining position, Vincent has never suggested that McKeon, Feeley, or Whitecotton harbored any discriminatory animus. McKeon's account is corroborated by his contemporaneous email of June 30, 2015. The Court therefore concludes that MedStar has proffered a legitimate, non-discriminatory reason for Vincent's termination.

### C.    Pretext

Because MedStar has provided a legitimate, non-discriminatory explanation, any presumption "created by the prima facie case is rebutted and simply 'drops out of the picture,'" and Vincent is left with the ultimate burden of "proving that the employer intentionally discriminated against the employee by reason of [race]." *Mitchell*, 12 F.3d at 1317 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). On this record, Vincent has not marshaled sufficient evidence for a reasonable jury to conclude that MedStar's decision was mere cover for an adverse employment action taken because of Vincent's race. Significantly, Vincent does not assert that any MedStar employee other than Moody had discriminatory

animus. The evidence, however, establishes that the termination decision was made by Feeley and Whitecotton, based on McKeon's recommendation.

In a discriminatory termination case, the discriminatory intent ordinarily must be harbored by the decisionmaker. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) ("It is the decision maker's intent that remains crucial . . . ."); *see also Hill*, 354 F.3d at 286. In limited circumstances, however, discriminatory intent can be imputed to the formal decisionmaker "when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (applying this principle to an alleged violation of the Uniformed Services Employment and Reemployment Rights Act, which "is very similar to Title VII"); *see also e.g.*, *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, --- F. App'x ---, No. 16-1295, 2017 WL 3531416, at *7-9 (Aug. 17, 2017) (applying *Staub* to a claim of sex discrimination and retaliation); *Morris v. McCarthy*, 825 F.3d 658, 668-69 (D.C. Cir. 2016) (applying *Staub* to a Title VII race discrimination claim); *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 906 (7th Cir. 2015) (same); *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294-96 (10th Cir. 2013) (applying *Staub* to a Title VII national origin claim); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350-51 & n.10 (6th Cir. 2012) (applying *Staub* to a Title VII race discrimination claim). Under the cat's paw theory of liability, evidence that a supervisor who was not the formal decisionmaker "perform[ed] an act motivated by [discriminatory] animus that [was] *intended* by the supervisor to cause an adverse employment action" could support a finding of discrimination "if that act [was] a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422 & n.3 (footnote omitted).

Here, there is no evidence that Moody participated in the termination decision, or that Feeley, Whitecotton, or McKeon sought and relied upon her recommendation. Although McKeon's June 30, 2015 email stated, "I know we will need to run this by Darlene Moody before a final decision can be made," J.R. 116, McKeon explained that that reference related to the recommendation to transfer the phlebotomist to the hospital laboratory department. Even assuming that the reference to consulting with Moody also related to the decision to eliminate Vincent's position, it implicitly establishes that McKeon's original recommendation, which was ultimately accepted, was formulated without input from Moody. Moreover, there is no evidence that Moody was actually consulted before Feeley and Whitecotton approved the reduction-in-force and termination and McKeon informed Moody of the decision on July 14, 2015.

At most, there is evidence to support the inference that Moody had, at various times, expressed a desire to have Vincent terminated. For example, in July 2014, Whetstone overheard Moody say that "Jaicia won't be here long," J.R. 133; in December 2014, Moody said that "if I want somebody fired I can get them fired," and looked at Vincent, J.R. 45; and in February 2015, Moody wrongfully accused Vincent of violating patient privacy rights. Moody also brought Begg, not Vincent, to meetings with MedStar relating to the integration. Moreover, Moody's efforts to prevent Vincent from attending MedStar management meetings, or speaking at those that she did attend, arguably could have been designed to undermine Vincent in favor of Begg, who was invited to attend instead of Vincent. But these efforts could not reasonably be deemed to be the proximate cause of the decision to terminate Vincent in favor of Begg, as required under *Staub*, particularly when there is no evidence that McKeon rejected Vincent or selected Begg based on their attendance at meetings, and it is undisputed that McKeon had a longstanding

working relationship with Begg that dated back to December 2012, well before Moody became Vincent's supervisor in November 2014.

Finally, even if there were evidence that Moody had caused Vincent's termination, there is insufficient evidence to establish that Moody's evident dislike of Vincent was motivated by race. Although she repeatedly yelled at Vincent, there is no evidence that she ever used racially derogatory language in those tirades. Significantly, Moody was known to do the same to white employees as well, including Tammy Hunt, who frequently came to Vincent in tears after Moody had verbally berated her. Although Vincent has reported that Begg told her that Moody had said that she does not like black people, Begg has denied making such a statement. Because Begg was not part of management such that her statements could be attributed to the company, Vincent's accounts of Begg's statements are inadmissible hearsay and may not be considered. *See Mansell v. Toys R Us, Inc.*, 673 F. Supp. 2d 407, 418-19 (D. Md. 2009) (declining to consider on a motion for summary judgment statements by a co-worker about the discriminatory animus of managers when they were presented in the form of inadmissible hearsay). Likewise, Whetstone's broad statement that "We were aware that Ms. Darlene Moody was racist," J.R. 131, also does not constitute factual evidence of discriminatory intent. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002) (finding that affidavits of two co-workers and a union representative stating that the plaintiff was "discriminated against because of his race," including a statement that "I believe [the manager] is a racist," constituted subjective beliefs insufficient to create a genuine issue of material fact on the issue of discrimination).

Thus, although Vincent provided substantial evidence that Moody disliked her, undermined her, and did not want to work with her, she has not provided sufficient evidence to establish that Moody's actions were motivated by racial animus. More importantly, as discussed

above, there is insufficient evidence to create a genuine issue of material fact on whether the actual termination decision, which was made by others, was motivated by race discrimination. Accordingly, the Court finds that MedStar is entitled to summary judgment on Vincent's claim of racially discriminatory termination under Title VII. Furthermore, because Title VII case law applies to both section 1981 and FEPA claims, the Court grants MedStar's motion with respect to Vincent's discrimination claims under those statutes as well. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 788-89 (D. Md. 2013) (citing *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 n.1 (4th Cir. 2004), and *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 483 n.20 (D. Md. 2013) ("Section 1981 and FEPA claims of discrimination are analyzed under the same framework as Title VII.").

### III.    Hostile Work Environment

Vincent also claims that even if Moody did not cause her termination for racially discriminatory reasons, Moody subjected her to a hostile work environment in violation of Title VII, which prohibits employers from discriminating against individuals with respect to "terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex[.]" 42 U.S.C. § 2000e–2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001). A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that the offending behavior was (1) unwelcome, (2)

based on gender or race, (3) "sufficiently severe or pervasive" to alter the conditions of employment and create "an abusive atmosphere," and (4) imputable to the employer. *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207-08 (4th Cir. 2014) (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]allous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

In support of her hostile work environment claim, Vincent has asserted that Moody refused to take calls or respond to emails from Vincent, failed to invite her to certain meetings, and once accused her of violating patients' privacy rights. In addition, in 2015, around the time that MedStar had decided to close the Waldorf office and select Begg as the sole remaining billing official originally from that office, Moody revoked Vincent's access to the new billing system and moved her to a small cubicle in the admissions department. Finally, Vincent and Whetstone asserted that Moody repeated yelled at her over the phone and recounted several specific instances of such behavior.

This pattern of conduct was not sufficiently severe and pervasive to establish a hostile work environment. Most of the conduct described—refusing to communicate with Vincent, not inviting her to meetings, restricting her access to computer systems, and moving her to a cubicle

at the time of the transition—suggests that Moody disfavored Vincent as an employee, but lack the necessary component of "discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

The only conduct that by its nature appears potentially supportive of a hostile work environment claim consists of the incidents when Moody yelled at Vincent over the telephone. On one occasion, Moody yelled at Vincent for not having her team sign up for training, used a condescending, demeaning tone, and said "Well, if I knew you were going to be that stupid . . . I would have done it myself." J.R. 59. On another, she yelled at Vincent and Whetstone for not checking whether certain patients were in the billing system. Vincent noted that although Moody yelled at other employees, too, Vincent "got it all the time," and Begg was never berated. J.R. 60. Whetstone characterized Moody's harassment of Vincent as "unrelenting," occurring almost daily, and stated that it was threatening and physically humiliating. J.R. 131-133. As a result of this "constant threatening conduct" directed at both Vincent and herself, Whetstone resigned in January 2015. J.R. 132-133.

These incidents, while inappropriate, fall short of establishing a hostile work environment claim. None involved any racial epithets or racially derogatory language that was so severe as to establish a hostile work environment. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 280 ("[A] reasonable jury could find that [the supervisor's] two uses of the "porch monkey" epithet . . . were severe enough to engender a hostile work environment."). There is no evidence that any of these telephone calls involved any "physically threatening" conduct; indeed, Moody and Vincent did not even work out of the same location. The circumstances in this case resemble those in *Rodriguez v. Kantor*, 162 F.3d 1155 (4th Cir. 1998) (unpublished table decision). in which the United States Court of Appeals for the Fourth Circuit affirmed the district court's conclusion that

21

a supervisor's giving of unrealistic assignments, isolating of the plaintiff from colleagues, "constant criticism, conflicting instructions and frequent shouting and screaming" was not severe and pervasive harassment. *Id.* at \*2, \*7; *see also Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (stating that allegations of the supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)).

Likewise, judges in this District have found that similar or even more egregious situations do not constitute a hostile work environment. For example, in *Khoury v. Meserve*, 268 F. Supp. 2d 600 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004), the court granted summary judgment to the employer where the employee complained not only of "disrespectful, frustrating, critical, and unpleasant" conduct, such as repeated criticism and questions about her background and when she had learned English, but also one incident in which a supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her." *Id.* at 614. In another case, the court found no hostile work environment where the employer showed "disdain and disrespect," "yelled at the plaintiff, "ignored her telephone calls and messages," and refused to provide her with resources. *See Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 312 (D. Md. 2015) ("And although being disrespectful to and yelling at an employee while ignoring her messages is not the hallmark of good conduct by a supervisor, 'even incidents that would objectively give

rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.'" (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008))).

Finally, there is insufficient evidence to establish that the unwelcome conduct was racially motivated. In none of the interactions did Moody use racial epithets or racially charged language. Vincent also acknowledged that Moody also yelled at and mistreated certain white employees. Specifically, Vincent stated that Moody frequently yelled at Hunt, who is white, to the point that she often brought Hunt to tears.

Vincent's citation of *Hall v. City of Chicago*, 713 F.3d 325 (7th Cir. 2013), is unpersuasive. In *Hall*, the court held that summary judgment should not have been granted on a hostile work environment claim where a supervisor deliberately gave the plaintiff, a female plumber, meaningless tasks, such as repeatedly watching videos of the inside of drainpipes and alphabetizing the same files over and over again, forbade all other employees who worked in the employee's department "from speaking to or associating with" the plaintiff, "ultimately excluded [the plaintiff] from every meeting during her time in the Division," and effectively made her "the Division pariah, undeserving of human interaction." *Id.* at 328-29, 331. The supervisor also engaged in a physical altercation when he bumped the plaintiff and made some "gender-specific comments," including referring to a woman as a "slut" and saying about the plaintiff, "I ought to slap that woman." *Id.* at 329. Here, Moody's yelling was not limited to Vincent or African American employees more generally, she did not isolate Vincent from others, and Moody made no racially charged statements to Vincent. The Court therefore grants summary judgment to MedStar on Vincent's hostile work environment claim under both Title VII and FEPA. *See Williams v. Silver Spring Volunteer Fire Dept.*, 86 F. Supp. 3d 398, 408 n.1, 412 (D. Md. 2015) (applying Title VII case law to the plaintiff's hostile work environment claim under FEPA).

## IV.    Retaliation

Finally, Vincent claims that she was terminated in retaliation for complaining about discriminatory treatment by Moody. Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must make a showing that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) there was a causal connection between the two events. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). The burden then shifts to the employer to identify a legitimate, non-retaliatory reason for taking the adverse employment action. *Id.* If the employer does so, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.*. "If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Id.*

Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). It "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). The plaintiff's actions are assessed in their totality, rather than as individual, discrete acts, to determine whether the plaintiff has opposed unlawful discrimination. *DeMasters*, 796 F.3d at 418. To qualify as protected activity, the employment

practices opposed may be either "actually unlawful under Title VII" or reasonably believed by the employee to be unlawful. *Boyer-Liberto*, 786 F.3d at 282.

At first glance, it is understandable that Vincent would have believed that she was the subject of retaliation. On August 18, 2015, she complained to Zeller, the Vice President of Human Resources that she believed that Moody was discriminating against her because of her race. On August 21, 2015, Zeller convened a meeting between her and Moody at which she was able to air her grievances. Then on, August 24, 2015, she was terminated by Zeller. These facts certainly establish that she engaged in protected activity and was the subject of an adverse employment action, and the timing likely gave Vincent the strong impression that the two events were causally linked. Based on the timing alone, Vincent has established the causation element of the *prima facie* case. *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) ("[T]hat his termination came so close upon his filing of the complaint gives rise to a sufficient inference of causation to satisfy the prima face requirement.").

MedStar, however, has presented evidence of a legitimate, non-retaliatory reason for the termination, namely, the reduction-in-force. In an email dated June 30, 2015, McKeon, recommended that Vincent's position be eliminated because of the "process and system improvements" resulting from the transition to the Invision software system. J.R. 115. The decision had become final by July 14, 2015, by when McKeon had received approval of his recommendation from Feeley and Whitecotton and had reported the decision to Moody, and by, at the latest, July 27, 2015, as reflected in an email to Zeller from Nancy Gillooly, Director of Compensation and Employment at MedStar SMHC, referencing a reduction-in-force and stating, "The eliminated position is 'Nursing Home Coordinator' which is occupied by Jaicia Vincent." J.R. 126. Where this decision was made *before* Vincent first complained about race

25

discrimination in August 2015, there is no causative link. Under this sequence of events, Vincent's termination could not have been caused by a desire to retaliate against Vincent, because the decision to terminate was made before the protected activity.

Where MedStar has established a legitimate, non-retaliatory reason for the termination, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons were not its true reasons, but were a pretext for discrimination." *Foster*, 787 F.3d at 250. Vincent cannot make such a showing because there is no evidence that she engaged in protected activity before August 2015. She first complained about Moody's mistreatment of her to Nelson and Hunt in December 2014 and January 2015, respectively. She acknowledged, however, that when she discussed these issues with Nelson and Hunt, she was confiding in her colleagues and friends and did not expect them to take any action based on the complaints. Even if the conversations included reference to Vincent's belief that she was being discriminated against, they do not resemble either informal grievances procedures or actions taken "in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259. Likewise, although Vincent also aired her complaints about Moody to Deabay in April 2015, those discussions do not qualify as protected activity because by that time, Deabay was retired and no longer worked at MedStar in any capacity.

Nor did Vincent's conversations with the Human Resources secretary between February and July 2015 constitute protected activity. On those occasions, Vincent stated, "Well, it's Darlene Moody, and I feel that I'm being mistreated and I just need to talk to [Zeller] and file a grievance" and provided a summary of her problems. J.R. 27. Vincent acknowledges, however, that she never told the secretary that she believed Moody's conduct was racially discriminatory, and she does not provide admissible evidence to support the conclusion that MedStar should

have understood her reference to "mistreatment" as alluding to discrimination. *See Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("Our cases hold that an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing *discriminatory conduct*." (emphasis added)); *see also Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248-49 (D. Md. 2016) (concluding that the employee's "initial complaints related only to general unfair treatment" alone were "not sufficient to allege that she communicated her belief to the [employer] that racially discriminatory practices were occurring").

Instead, Vincent has acknowledged that the first time she reported that she believed she was being subjected to race discrimination was when she told Moody in August 2015 and then formally reported the alleged discrimination to Zeller on August 18, 2015. Because Vincent has not rebutted MedStar's evidence that the decision to eliminate her position preceded any protected activity taken by her, and that the decisionmakers were therefore not aware of any protected activity at the time the decision to terminate her position was made, the Court will grant summary judgment in favor of MedStar on Vincent's retaliation claim under Title VII. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, an employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish [the causation element]."); *see also Swigert v. Broadway Servs., Inc.*, No. RDB-08-1139, 2009 WL 2139711, at *10 (D. Md. July 15, 2009) (explaining that an inference of retaliation may be created where there is "[t]emporal proximity between a complaint and a termination," but that "such an inference may be eliminated by other evidence showing that a

substantial step toward termination had occurred prior to the employee's submission of a complaint").

For the same reasons, the Court grants summary judgment on Vincent's state law FEPA retaliation claim. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012) (applying the same reasoning to deny both federal and Maryland employment discrimination claims); *Countess v. Maryland*, No. ELH-12-02252, 2014 WL 201591, at *5 (D. Md. Jan. 16, 014) (applying federal law to the employee's retaliation claim under Maryland anti-discrimination law).

## CONCLUSION

This lawsuit likely could have been avoided had MedStar not mismanaged this situation from beginning to end. When Moody displayed verbally abusive behavior to Vincent and other employees, and undermined her as a supervisor by inviting her subordinate to meetings with management instead of her, the company should have stepped in. Instead, when Vincent contacted Human Resources, no one ever responded to her. When the company was preparing to transition to an automated billing system, McKeon selected Begg, someone with whom he had worked even before Moody became Vincent's supervisor, for the only remaining position, without ever posting the position or allowing Vincent to compete for that position. Instead, Vincent was kept in the dark about her fate, and when she finally directly complained about Moody, MedStar fired her within a week, without any explanation of the process by which that decision was reached. Vincent therefore justifiably feels aggrieved by how she was treated by both Moody and MedStar.

She has not, however, established evidence that would support a finding that her termination, a decision made by managers other than Moody, was motivated by race

discrimination, that her mistreatment rose to the level of establishing a racially hostile work environment under the law, or that her poorly timed termination was the result of unlawful retaliation for her complaints about Moody.

For the foregoing reasons, MedStar's Motion for Summary Judgment is GRANTED. A separate Order shall issue.

Date: August 22, 2017

THEODORE D. CHUANG
United States District Judge